**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MONSTER ENERGY COMPANY,

   Plaintiff,

v.

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A",

   Defendants.

Case No. 26-cv-09494

**COMPLAINT**

Plaintiff Monster Energy Company ("MEC" or "Plaintiff") hereby brings the present action

against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto

(collectively, "Defendants") and alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action

pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Copyright Act 17

U.S.C. § 501, *et seq.*, 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may

properly exercise personal jurisdiction over Defendants since each of the Defendants directly

targets business activities toward consumers in the United States, including Illinois, through at

least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in

Schedule A attached hereto (the "Seller Aliases").  Specifically, Defendants have targeted sales to

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces.

Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars from U.S. consumers have sold products using infringing and counterfeit versions of MEC's federally registered trademarks and/or unauthorized copies of MEC's federally registered copyrighted work (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused MEC substantial injury in the State of Illinois.

## II.  INTRODUCTION

3.  This action has been filed by MEC to combat e-commerce store operators who trade upon MEC's reputation and goodwill by selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale and selling Unauthorized Products to unknowing consumers. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their operation. MEC is forced to file this action to combat Defendants' counterfeiting of MEC's registered trademarks and infringement of MEC's registered copyrighted work, as well as to protect unknowing consumers from purchasing Unauthorized Products over the Internet. MEC has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks and infringement of its copyrighted work as a result of Defendants' actions and seeks injunctive and monetary relief.

### III.   THE PARTIES

**Plaintiff**

4.     Plaintiff MEC is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1 Monster Way, Corona, California 92879.

5.     MEC is a nationwide leader in the business of developing, marketing, and selling beverages, including energy drinks.  In 2002, long before Defendants' acts described herein, MEC launched its MONSTER ENERGY® brand of drinks bearing its now famous MONSTER® mark, MONSTER ENERGY® mark,  MONSTER® mark, M MONSTER ENERGY® mark,  ® ("Claw Icon") mark,  and copyrighted  work (the "Monster Energy Copyrighted Work").  A true and correct representation of MEC's original MONSTER ENERGY® drink is shown below:



6.     MEC's successful line of MONSTER® drinks has now grown to include numerous other well-known products, including, but not limited to, original MONSTER ENERGY®; MONSTER ENERGY® ZERO SUGAR; MONSTER ENERGY® LO-CAL; MONSTER ENERGY® LO-CARB; and MONSTER ENERGY ASSAULT®; the JUICE MONSTER® line of drinks (which includes or has included products such as JUICE MONSTER® KHAOS®, JUICE MONSTER® RIPPER®, JUICE MONSTER® PIPELINE PUNCH®, JUICE MONSTER®

3

MANGO LOCO®, JUICE MONSTER® PACIFIC PUNCH, JUICE MONSTER® KHAOTIC®, JUICE MONSTER® PAPILLON® , and JUICE MONSTER® AUSSIE STYLE LEMONADE); MONSTER ENERGY® IMPORT; PUNCH MONSTER® BALLER'S BLEND™; PUNCH MONSTER® MAD DOG®; MONSTER ENERGY UNLEADED®; MONSTER ENERGY ABSOLUTELY ZERO®; MONSTER® RESERVE WATERMELON, MONSTER® RESERVE WHITE PINEAPPLE, MONSTER® RESERVE ORANGE DREAMSICLE® and MONSTER® RESERVE KIWI STRAWBERRY; MONSTER MULE®; the MONSTER ENERGY ULTRA® line of drinks (which includes or has included products such as MONSTER ENERGY ZERO ULTRA®, MONSTER ENERGY ULTRA BLUE®, MONSTER ENERGY ULTRA RED®, MONSTER ENERGY ULTRA BLACK®, MONSTER ENERGY ULTRA CITRON®, MONSTER ENERGY ULTRA SUNRISE®, MONSTER ENERGY® ULTRA PEACHY KEEN®, MONSTER ENERGY® ULTRA STRAWBERRY DREAMS®, MONSTER ENERGY ULTRA® WATERMELON, MONSTER ENERGY ULTRA GOLD®, MONSTER ENERGY ULTRA PARADISE®, MONSTER ENERGY ULTRA® FIESTA MANGO, MONSTER ENERGY ULTRA® ROSÁ, and MONSTER ENERGY ULTRA VIOLET®); MONSTER CUBA-LIMA®; UBERMONSTER® (a bio-activated non-alcoholic energy brew produced using brewing technology which converts sugar into organic acids); MONSTER REHAB®, which has been rebranded to REHAB MONSTER®, a line of non-carbonated energy drinks (which includes or has included products such as REHAB MONSTER® WILD BERRY TEA; REHAB MONSTER® WATERMELON, REHAB MONSTER® TEA + LEMONADE, REHAB MONSTER® STRAWBERRY LEMONADE, REHAB MONSTER® PEACH TEA, REHAB MONSTER® ORANGEADE, and REHAB MONSTER® RASPBERRY TEA); JAVA MONSTER®, which is a line of coffee plus energy drinks (some of which contain dairy); MUSCLE MONSTER®, which is

4

a line of energy shakes infused with protein; MONSTER ENERGY EXTRA STRENGTH NITROUS TECHNOLOGY® which has been rebranded to MONSTER ENERGY® NITRO, which is a line of energy drinks infused with nitrous-oxide creating a smoother energy drink; CAFFÉ MONSTER®; ESPRESSO MONSTER®; MONSTER HYDRO®; and MONSTER DRAGON ICED TEA®, among others (collectively, "MONSTER® line of drinks").

7.     Shown below are true and accurate representative pictures illustrating some of MEC's MONSTER® line of drinks and the packaging for certain products in that line.



8.     In addition to its MONSTER® line of energy drinks, long before Defendants' acts described herein, MEC has used, and continues to use, its Claw Icon Mark, MONSTER® mark, MONSTER ENERGY® mark, and the Monster Energy Copyrighted Work in connection with a large variety of other products, including, but not limited to, shirts, sweatshirts, jackets, hats, socks, jerseys, pants, belts, bandanas, sweatbands, gloves, headgear, sunglasses, beverage ware, cups, water bottles, koozies, sports bags, backpacks, fanny packs, cooler bags, duffel bags, suitcases, laptop bags, towels, blankets, umbrellas, beach/lawn chairs, tents, vanity cases, guitars, drum heads, clocks, watches, boom boxes, speakers, head sets, bottle openers, protective gear,

keychains, surfboards, skate boards, surf boards, wake boards, BBQ tool sets, automotive rims, tool kits, vehicles, vehicle decals, helmet, neon signs, coasters, buckets, golf accessories, fitness goods and equipment (e.g., exercise bike), punching bags, MMA or boxing gloves, food & beverage service goods (e.g., bar accessories, bar mats), video games (e.g., video game discs, downloadable applications), gaming controllers, gaming chairs, gaming desks, gaming equipment (e.g., keyboards, wrist rest and mouse), headsets, headphones, earbuds, wireless earbuds, projectors, phone chargers, USB drives, stickers, helmets, bikes, jewelry, banners, coolers, electric coolers, lunch bags, car cup cellphone holders, books (e.g. notebooks, calendar books) and electronic books (e.g., point-of-sale-catalog books), channel strips, power banks, posters, pens, bracelets, lanyards, diecast cars, remote control replica cars, yoga mats, downloadable multimedia files (e.g., screen savers, wallpapers, video recordings), and other accessories and merchandise that bear Claw Icon Mark, MONSTER® mark, MONSTER ENERGY® mark, and/or the Monster Energy Copyrighted Work (collectively, the "Monster Energy Products"). Examples of authorized helmets, apparel and accessories bearing MEC's Claw Icon Mark, MONSTER® mark, MONSTER ENERGY® mark, and/or the Monster Energy Copyrighted Work are shown below.

House Brand Line





MONSTER ARMY™ Line



MUSCLE MONSTER™ Line



8

JAVA MONSTER™ Line



Claw Icon Helmets



9. Since the initial launch of its original MONSTER ENERGY® drink in 2002, MEC's Claw Icon Mark, MONSTER® mark, MONSTER ENERGY® mark, and the Monster Energy Copyrighted Work are and have been the subject of substantial and continuous marketing and promotion by MEC in connection with its MONSTER® line of drinks and MONSTER® apparel and accessories. MEC has and continues to widely market and promote its Claw Icon Mark, MONSTER® mark, MONSTER ENERGY® mark, and the Monster Energy Copyrighted Work. MEC's promotional efforts include — by way of example but not limitation — the Monster Energy website and social media sites, point of sale materials, sponsorship of athletes and athletic teams, sponsorship of athletic competitions, sponsorship of musicians, sponsorship of live and televised events, sweepstakes, music concerts, attendance at trade shows, product sampling, and apparel and merchandise.

10. Since the Claw Icon Mark and MONSTER ENERGY® mark (collectively, the "MONSTER ENERGY Trademarks") are the MEC trademarks most commonly counterfeited and infringed by Defendants, MEC focuses its allegations on the MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work.

11. MEC sponsors over 430 sports athletes and numerous athletic events in connection with its branded drinks, apparel, and accessories bearing one or both of the MONSTER ENERGY Trademarks and/or the Monster Energy Copyrighted Work. For example, MEC sponsors or has sponsored sporting events such as Professional Fighting, including the Ultimate Fighting Championship ("UFC"); Bodybuilding; Powerlifting; Basketball; Baseball; Hockey; NASCAR; Road Racing World Championship Grand Prix ("MotoGP") events; the Monster Energy Yamaha Tech 3 Moto GP racing team (as the title sponsor); the Yamaha Factory Racing MotoGP Team (as its official energy product sponsor), which previously included renowned Moto-GP racers

Valentino Rossi (nine-time MotoGP Grand Prix World Champion; seven-time champion in the premier class) and Jorge Lorenzo (five-time MotoGP Grand Prix World Champion; three-time in the premier class); Team Ducati Lenovo MotoGP; reigning MotoGP World Champion Francesco Bagnaia, (a member of Team Ducati Lenovo); Team Suzuki Ecstar MotoGP (as its official partner and exclusive energy product sponsor); the Mercedes AMG PETRONAS F1 racing team (formerly the Mercedes GP PETRONAS Formula One racing team) that competes in the FIA Formula One World Championship Series ("F1") with its current team drivers Sir Lewis Hamilton and George Russell; the Yamaha MX1 and MX2 motocross teams; the AMA Supercross Series (as the title sponsor for all 16 series races); and sponsorship and promotion of music festivals, music events, and musicians. At MEC-sponsored events, the MONSTER ENERGY Trademarks and/or the Monster Energy Copyrighted Work are prominently promoted at the events on banners, posters, signs, and on clothing and accessories sold at the events, on transport, support, and hospitality tractor trailers, and on motor homes and promotional vehicles that tour the circuit for various sports.

12. In addition to the sporting events above, MEC also sponsors or has sponsored athletes and athletic teams who compete in a wide variety of sports, including Summer and Winter X Games, Monster Energy® AMA Supercross Series, Road Racing World Championship Grand Prix ("MotoGP") series, and Rally Car events, among many other events. Many of the events that the MEC-sponsored athletes and athletic teams compete in are broadcast nationally on television, and all of the MEC-sponsored athletes and teams wear clothing or accessories or use equipment that prominently displays one or both of the MONSTER ENERGY Trademarks and/or the Monster Energy Copyrighted Work.

11

13.     MEC's MONSTER® family of products has achieved substantial commercial success.  Worldwide retail sales of the MONSTER® line of energy drinks now exceed 6.7 billion cans per year worldwide with estimated retail sales exceeding approximately more than US$14 billion per year worldwide.  MEC has sold more than 29 billion cans of worldwide, all of which bear the Claw Icon Mark, MONSTER® Mark, the Monster Energy Copyrighted Work, and/or the MONSTER ENERGY® Mark.  Currently, by unit volume and dollar value, MONSTER® energy drinks are among the top two best-selling energy drinks in the United States and the second best-selling worldwide by dollar value.   As a result of MEC's substantial use and promotion of the MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work in connection with its MONSTER® family of products, MEC's MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work have acquired great value as specific identifiers of MEC's products, are widely recognized by the general consuming public as a designation of the source of goods or services of MEC, and serve to identify and distinguish MEC's products from those of others. Customers in this judicial district and elsewhere readily recognize MEC's MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work as distinctive designations of the origin of MEC's drinks, accessories, clothing products, sports bags and backpacks, sports gear and other products and promotional items.  MEC's MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work are intellectual property assets of enormous value as symbols of MEC and its quality products, reputation, and goodwill.

14.     MEC is the owner of numerous trademark registrations for the MONSTER ENERGY Trademarks, including, but not limited to, the following U.S. Trademark Registrations:

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
| --- | --- |
| 3,057,061 4,036,681 | MONSTER ENERGY |

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
|---|---|
| 3,044,315<br>4,036,680<br>5,820,689<br>5,661,940 | |
| 2,903,214 | |
| 4,051,650 | |
| 3,963,669 | |
| 3,963,668 | |

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
|---|---|
| 4,011,301 | |
| 4,822,675 | |
| 3,134,841 | |
| 3,923,683 | |
| 3,908,601 | |

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
|---|---|
| 3,908,600 | |
| 3,914,828 | |
| 4,332,062 | |
| 4,660,598 | |
| 3,134,842<br>3,044,314 | M MONSTER ENERGY |
| 4,634,053 | MONSTER ASSAULT |
| 3,959,457 | JAVA MONSTER |
| 3,852,118 | LO-CARB MONSTER ENERGY |
| 5,570,782 | |

15

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
|---|---|
| 5,580,962 | |
| 5,551,192 | MONSTER ARMY |
| 5,551,230 | |
| 5,022,676 | |
| 4,865,702 | |
| 5,889,011 | |
| 6,451,182 | |
| 6,760,278 | MONSTER |

16

15. The above U.S. registrations for the MONSTER ENERGY Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to pursuant to 15 U.S.C. § 1065. True and correct copies of the federal trademark registration certificates for the above MONSTER ENERGY Trademarks are attached hereto as **Exhibit 1**.

16. The MONSTER ENERGY Trademarks are distinctive and identify the merchandise as goods from MEC. The registrations for the MONSTER ENERGY Trademarks constitute *prima facie* evidence of their validity and of MEC's exclusive right to use the MONSTER ENERGY Trademarks pursuant to 15 U.S.C. § 1057 (b).

17. The MONSTER ENERGY Trademarks qualify as famous marks, as that term is used in 15 U.S.C. §1125 (c)(1), and have been continuously used and never abandoned.

18. In addition to its use on its energy drinks, MEC has continuously used the MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work on and in connection with the creation and distribution of Monster Energy Products. These items have been worn or used by numerous high profile athletes and entertainers sponsored by MEC. MEC has also licensed the MONSTER ENERGY Trademarks and the Monster Energy Copyrighted Work to third parties for use on stickers, clothing items, automotive parts, protective gear, sports bags and other products. MEC tightly controls its limited number of licensees and the quantities of goods they produce along with the look, feel, manufacturing and distribution of these goods. MEC has promoted its MONSTER® drinks and Monster Energy Products in interstate and intrastate commerce, including commerce in the State of Illinois, and in this Judicial District.

19. MEC has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the MONSTER ENERGY Trademarks. As a result, products

17

bearing the MONSTER ENERGY Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from MEC.

20. Because of MEC's advertising and promotional efforts and its continuous use of the MONSTER ENERGY Trademarks for more than a decade, MEC is among the most recognized energy drink brands in the United States, and the MONSTER ENERGY Trademarks have become famous.

21. MEC has registered its Monster Energy Copyrighted Work with the United States Copyright Office. The registrations include, but are not limited to, "Stylized claw with jagged edges (original version)" (U.S. Copyright Registration No. VA 1-789-900), issued by the Register of Copyrights on October 11, 2011, and the corresponding supplemental registration changing ownership name from Hansen Beverages Company to Monster Energy Company: VA 1-433-242. A true and correct copy of the U.S. federal copyright registration certificate for the above-referenced Monster Energy Copyrighted Work is attached hereto as **Exhibit 2**.

22. Among the exclusive rights granted to MEC under the U.S. Copyright Act are the exclusive rights to reproduce, prepare derivative works of, distribute copies of, and display the Monster Energy Copyrighted Work to the public.

23. Since first publication, the Monster Energy Copyrighted Work has been used on the Monster Energy Products and is featured on MEC's website at monsterenergy.com. Monster Energy Products featuring the Monster Energy Copyrighted Work are advertised on MEC's website at monsterenergy.com.

**The Defendants**

24. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on

18

Schedule A and/or other seller aliases not yet known to MEC. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

25. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for MEC to learn Defendants' true identities and the exact interworking of their network. If Defendants provide additional credible information regarding their identities, MEC will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

4. The success of the Monster Energy brand has resulted in significant infringement and counterfeiting of the MONSTER ENERGY Trademarks and copying of the Monster Energy Copyrighted Work. In recent years, MEC has identified many fully interactive, e-commerce stores offering counterfeit Monster Energy Products on online marketplace platforms such as Amazon, eBay, Walmart, and Temu, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. At last count, global trade in counterfeit and pirated goods was worth an estimated $467 billion per year — accounting for a staggering 2.3% of all imports, according to the Organization for

19

Economic Cooperation and Development (the "OECD").[2]  The primary source of all those counterfeits, the OECD and others say, is China.[3]

26.  Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms."[4]  Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts.[5] Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated.[6]  Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters."[7]

27.  Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars from U.S.

---

[2] *See* Press Release, Organization for Economic Cooperation and Development, *Global trade in fake goods reached USD 467 billion, posing risks to consumer safety and compromising intellectual property* (May 7, 2025), https://www.oecd.org/en/about/news/press-releases/2025/05/global-trade-in-fake-goods-reached-USD-467-billion-posing-risks-to-consumer-safety-and-compromising-intellectual-property.html.

[3] *Id.*; *See also, Intellectual Property Rights Seizure Statistics, Fiscal Year 2024*, U.S. Customs and Border Protection.

[4] *See* Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary.

[5] *"Combating Trafficking in Counterfeit and Pirated Goods," supra* note 4, at 22.

[6] *Id.* at p. 39.

[7] Chow, *supra* note 4, at p. 186-87.

20

consumers, and have sold Unauthorized Products to residents of Illinois. Screenshots evidencing Defendant's infringing activities are attached as **Exhibit 3.**

28. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases look sophisticated and accept payment in U.S. dollars from U.S. consumers. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. MEC has not licensed or authorized Defendants to use its MONSTER ENERGY Trademarks or copy or distribute the Monster Energy Copyrighted Work, and none of the Defendants are authorized retailers of genuine Monster Energy Products.

29. Many Defendants also deceive unknowing consumers by using the MONSTER ENERGY Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Monster Energy Products. Other e-commerce stores operating under the Seller Aliases omit using the MONSTER ENERGY Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Monster Energy Products.

30. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

31.     E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products.  Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their infringing operation, and to avoid being shut down.

32.     Defendants are collectively causing harm to Plaintiff's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression.  Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences.  The combination of all Defendants engaging in the same illegal activity in the same time span causes a collective harm to Plaintiff in a way that individual actions, occurring alone, might not.

33.     E-commerce store operators like Defendants communicate with each other on chat rooms and through websites regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits

34.     Infringers such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of MEC's enforcement.  E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to MEC.  Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore infringers regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

35.     Defendants are working to knowingly and willfully import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences.  Defendants, without any authorization or license from MEC, have knowingly and willfully used and continue to use the MONSTER ENERGY Trademarks and/or copies of the Monster Energy Copyrighted Work in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

36.     Defendants' unauthorized use of the MONSTER ENERGY Trademarks and/or Monster Energy Copyrighted Work in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming MEC.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

37.     MEC hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

38.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered MONSTER ENERGY Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  The MONSTER ENERGY Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Monster Energy Products offered, sold, or marketed under the MONSTER ENERGY Trademarks.

39.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the MONSTER ENERGY Trademarks without MEC's permission.

40. MEC is the exclusive owner of the MONSTER ENERGY Trademarks. MEC's United States Registrations for the MONSTER ENERGY Trademarks (**Exhibit 1**) are in full force and effect. On information and belief, Defendants have knowledge of MEC's rights in the MONSTER ENERGY Trademarks, and are willfully infringing and intentionally using counterfeits of the MONSTER ENERGY Trademarks. Defendants' willful, intentional and unauthorized use of the MONSTER ENERGY Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

41. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

42. MEC has no adequate remedy at law, and if Defendants' actions are not enjoined, MEC will continue to suffer irreparable harm to its reputation and the goodwill of its famous MONSTER ENERGY Trademarks.

43. The injuries and damages sustained by MEC have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Unauthorized Products.

## COUNT II
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

44. MEC hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

45. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with MEC or the origin, sponsorship, or approval of Defendants' Unauthorized Products by MEC.

24

46.     By using the MONSTER ENERGY Trademarks in connection with the Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

47.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

48.     MEC has no adequate remedy at law and, if Defendants' actions are not enjoined, MEC will continue to suffer irreparable harm to its reputation and the associated goodwill of its brand.

## COUNT III
## COPYRIGHT INFRINGEMENT OF UNITED STATES COPYRIGHT REGISTRATION
### (17 U.S.C. §§ 106 AND 501)

49.     MEC hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

50.     The Monster Energy Copyrighted Work constitutes an original work and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. §§ 101, *et seq.*

51.     MEC has complied with the registration requirements of 17 U.S.C. § 411(a) for the Monster Energy Copyrighted Work. The Monster Energy Copyrighted Work is protected by Copyright Registration No. VA 1-789-900, and the corresponding supplemental registration changing ownership name from Hansen Beverages Company to Monster Energy Company, VA 1-433-242, which was duly issued to MEC by the United States Copyright Office.  At all relevant times, MEC has been and still is the owner of all rights, title, and interest in the Monster Energy Copyrighted Work, which has never been assigned, licensed, or otherwise transferred to Defendants.

25

52. The Monster Energy Copyrighted Work is published on the internet and available to Defendants online. As such, Defendants had access to the Monster Energy Copyrighted Work via the internet.

53. Without authorization from MEC, or any right under the law, Defendants have deliberately copied, displayed, distributed, reproduced and/or made derivate works incorporating the Monster Energy Copyrighted Work on the e-commerce stores operating under the Seller Aliases and the corresponding Unauthorized Products. Defendants' derivative works are virtually identical to and/or are substantially similar to the look and feel of the Monster Energy Copyrighted Work. Such conduct infringes and continues to infringe the Monster Energy Copyrighted Work in violation of 17 U.S.C. § 501(a) and 17 U.S.C. §§ 106(1)–(3), (5).

54. Defendants reap the benefits of the unauthorized copying and distribution of the Monster Energy Copyrighted Work in the form of revenue and other profits that are driven by the sale of Unauthorized Products.

55. Defendants have unlawfully appropriated MEC's protectable expression by taking material of substance and value and creating Unauthorized Products that capture the total concept and feel of the Monster Energy Copyrighted Work.

56. On information and belief, Defendants' infringement has been willful, intentional, and purposeful, and in disregard of and with indifference to, MEC's rights.

57. Defendants, by their actions, have damaged MEC in an amount to be determined at trial.

58. Defendants' conduct is causing, and unless enjoined and restrained by this Court will continue to cause, MEC great and irreparable injury that cannot fully be compensated or measured in money. MEC has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, MEC is

26

entitled to a preliminary and permanent injunction prohibiting further infringement of the Monster Energy Copyrighted Work.

### PRAYER FOR RELIEF

WHEREFORE, MEC prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the MONSTER ENERGY Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Monster Energy Product or is not authorized by MEC to be sold in connection with the MONSTER ENERGY Trademarks;

   b. reproducing, distributing copies of, making derivative works of, or publicly displaying the Monster Energy Copyrighted Work in any manner without the express authorization of MEC;

   c. passing off, inducing, or enabling others to sell or pass off any product as a genuine Monster Energy Product or any other product produced by MEC that is not MEC's or not produced under the authorization, control, or supervision of MEC and approved by MEC for sale under the MONSTER ENERGY Trademarks and/or the Monster Energy Copyrighted Work;

   d. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of MEC, or are sponsored by, approved by, or otherwise connected with MEC;

27

    e.  further infringing the MONSTER ENERGY Trademarks and/or the Monster Energy Copyrighted Work and damaging MEC's goodwill; and

    f.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for MEC, nor authorized by MEC to be sold or offered for sale, and which bear any of MEC's trademarks, including the MONSTER ENERGY Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof and/or which bear the Monster Energy Copyrighted Work;

2) Entry of an Order that, upon MEC's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, Amazon, Walmart, and Temu, (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the MONSTER ENERGY Trademarks and/or which bear the Monster Energy Copyrighted Work;

3) That Defendants account for and pay to MEC all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the MONSTER ENERGY Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that MEC be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the MONSTER ENERGY Trademarks;

5) As a direct and proximate result of Defendants' infringement of the Monster Energy Copyrighted Work, MEC is entitled to damages as well as Defendants' profits, pursuant to 17 U.S.C. § 504(b);

6) Alternatively, and at MEC's election prior to any final judgment being entered, MEC is entitled to the maximum amount of statutory damages provided by law, $150,000 per work infringed pursuant to 17 U.S.C. § 504(c), or for any other such amount as may be proper pursuant to 17 U.S.C. § 504(c);

7) MEC is further entitled to recover its attorneys' fees and full costs for bringing this action pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

8) That Defendants be ordered to destroy any products bearing the MONSTER ENERGY Trademarks, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, pursuant to 15 U.S.C. § 1118;

9) That Defendants be ordered to deliver and destroy all devices, literature, advertising, goods, and other unauthorized materials bearing the Monster Energy Copyrighted Work pursuant to 17 U.S.C. § 503(b); and

10) Award any and all other relief that this Court deems just and proper.

Dated this 7th day of August 2026.       Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Trevor C. Talhami
Thomas J. Juettner
Greer, Burns & Crain, Ltd.
200 West Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
ttalhami@gbc.law
tjjuettner@gbc.law

*Attorneys for Plaintiff Monster Energy Company*